J-S28014-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1792 WDA 2016 |

Appeal from the Order October 28, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  TPR No. CP-02-AP-000109-2016

BEFORE:   OLSON, MOULTON, and STRASSBURGER[*], JJ.

MEMORANDUM BY OLSON, J.:                    **FILED MAY 10, 2017**

M.S., Jr. ("Father") appeals from the order entered on October 28, 2016, granting the petition filed by the Allegheny County Office of Children and Youth and Families ("OCYF" or the "Agency"), and involuntarily terminating Father's parental rights to his male child, M.S., III, born in November 2011 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]  Father's counsel ("Counsel"), has filed with this Court a petition for leave to withdraw as counsel and a brief pursuant to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] In a termination order entered on October 28, 2016, the trial court also terminated the parental rights of Child's mother, F.L.S. ("Mother"), and any unknown father.  Neither Mother nor any unknown father has filed an appeal, nor is Mother or any such individual a party to the present appeal.

*Anders v. California*, 386 U.S. 738, 744 (1967).[2] We affirm, and grant

Counsel's petition to withdraw.

In its opinion to this Court, the trial court adeptly set forth the factual

background of this appeal. As the trial court explained:

> [On May 23, 2016, OCYF filed a petition seeking to involuntarily terminate the parental rights of Father. The trial court held an evidentiary hearing on October 28, 2016. Father was incarcerated at the time of the hearing, but he participated *via* telephone. During the hearing,] Sarah Deak (["Ms. Deak")], a caseworker for OCYF, testified that Child first came to the attention of OCYF in July [] 2011 because OCYF was concerned with Mother's "housing and stability." Mother reported that she was "overwhelmed with parenting two kids while being pregnant with a third child." There were also allegations of domestic violence between Mother and Father. In September [] 2011, Mother moved outside of Allegheny County and the case was closed.
>
> On November 20, 2012, a referral was made to OCYF because there were concerns with inadequate physical care of the children. OCYF accepted the case for service and the case remained open[] with OCYF until it closed on March 8, 2013, because the family lived outside of Allegheny County.
>
> In May 2014, OCYF [was] requested by Washington County to assess the safety of Child's [] sibling, C.C., a dependent child in Washington County. OCYF of Allegheny County accepted the case for service and the case remained open. From May 22, 2014[] until October 13, 2014, OCYF provided 353 [] in-home services through Project Star. For

---

[2] In ***In re V.E.***, 611 A.2d 1267, 1275 (Pa. Super. 1992), this Court extended the ***Anders*** principles to appeals involving the termination of parental rights. We stated that counsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating parental rights may, after a conscientious and thorough review of the record, petition this Court for leave to withdraw representation and must submit an ***Anders*** brief. ***Id***. at 1275.

a portion of this time, Father was not incarcerated and lived in the home and was able to participate in the services provided. OCYF worked with Mother using the Teaming and Conferencing model, however, Father chose not to participate in the family conference with OCYF in July [] 2014. Additionally, Father was aware of the caseworkers in the home but did not communicate with OCYF. The in-home services continued to work with the family.

On October 31, 2014, OCYF filed an Emergency Custody Authorization [("ECA")] because there were concerns that Mother "left [Child's sibling, N.C.,] in the care of a maternal cousin for several days and was not willing to pick him up." Additionally, there were concerns that Mother was leaving Child with paternal grandfather "while there was an active Child Line for allegations that he had sexually maltreated [N.C.]." Child was not removed [from the house;] however, N.C. was removed at that time. OCYF did not execute the ECA for Child because Mother stated that she would not place Child in the care of paternal [grandfather] any longer.

On January 28, 2015, OCYF requested an ECA[,] which was approved[,] and a shelter hearing was conducted [] on that date. At that time, Child was removed because Mother "was sharing a home with someone who had drug and alcohol issues," and there were concerns with Mother's housing and stability. Child was placed in foster care through Auberle. Child has remained in care since January 28, 2015.

On March 11, 2015, Child was adjudicated dependent pursuant to 42 [Pa.C.S.A. §] 6302. . . .

[OCYF began providing services to the family in May 2014. Despite Father's presence in the home at that time,] Father did not cooperate or participate [with OCYF]. Father was incarcerated on or about October 31, 2014, and has remained incarcerated throughout the entirety of Child's removal, subsequent placement, and determination of dependency. Child has not returned to Father's care. In October 2015, Father contacted OCYF when he was incarcerated in Westmoreland County. Ms. Deak testified that Father continued to send letters to OCYF "about once a

month" and requested information regarding the case and visitation with Child.

On September 3, 2015, a permanency review hearing was held and Father was granted visitation with Child at the prison. Father was initially incarcerated in Westmoreland County Jail. OCYF eventually learned that Father was moved to SCI Camp Hill and then subsequently transferred to Quehanna [B]oot [C]amp. As of October 28, 2016, Father was [incarcerated] at SCI Houtzdale. Ms. Deak testified that it was a "complex process" to facilitate visitation because Father continued to transfer to different prisons while OCYF attempted to arrange visitation in compliance with the policies of the respective prisons. Consequently, visitation did not occur at any of these locations.

On March 16, 2016, [the trial court] ordered that Father was permitted to have weekly phone calls with [Child], supervised by his mobile therapist to assist [Child] with processing these calls. If phone calls go well for a period of one [] month, [Child] may visit his father at Quehanna Boot Camp, upon agreement of all parties. Ms. Deak explained that Child's mobile therapist was "not comfortable" supervising the phone calls. Eventually[,] Child's Foster Mother agreed to facilitate the phone calls but did not want to use her personal phone number. OCYF was ordered to provide Foster Mother with a TRAC phone. On June 22, 2016, [the trial court] acknowledged that Father had been unable to have phone calls with Child up to that date "due to various obstacles." However, Father testified that he eventually had phone calls with Child while incarcerated. Their last phone call was October 10, 2016.

Father's goals include drug and alcohol and domestic violence [counseling]. Father reported to Ms. Deak that he completed a violence prevention and drug and alcohol [program] at boot camp. However, the boot camp was unable to confirm what specific programs he successfully completed. Father testified that he sent Ms. Deak certificates of his completion of the programs. At the time of the October 28, 2016[] hearing, Ms. Deak did not receive that documentation.

Father has an extensive criminal record. Father admitted to having led a criminal lifestyle after being incarcerated as a juvenile. Father estimates that he has been incarcerated for about eight years since the age of [15]. His previous charges include drug charges, gun charges, receiving stolen property, and other misdemeanor offenses. Father is currently incarcerated at SCI Houtzdale for [] possession of heroin and crack cocaine with intent to deliver. Father had a potential release date of September [] 2016[;] however[,] Father testified in a permanency review hearing on September 14, 2016, that his release date was extended because he took a cookie he was not permitted to take. Father was removed from boot camp and now has to serve his minimum sentence. Additionally, Father explained that he forged documents to help another inmate get released[. Father testified]:

> For me to get removed, an inmate, you have to send home your home plan and get it signed by the guardian that is willing to take you in to get released. . . . So, [my fellow inmate's] home plan [was] rejected. So, he had tried again. And I had written in my handwriting a different name for him that he had wanted to get. So, it was just basically my handwriting. And they found out about it. That it was basically like something bogus. And I got questioned about it. I didn't tell the truth about it and I got removed.

Father's violation extended his minimum release date to December [] 2017.

On October 28, 2016, [the trial court] granted OCYF's petition to terminate Father's parental rights.

Trial Court Opinion, 1/13/17, at 3-7 (internal citations and some internal footnotes, capitalization, and quotations omitted).

Father filed a timely notice of appeal and a concise statement pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Counsel filed a petition for leave to withdraw as counsel for Father and an ***Anders*** brief on February 12, 2017.

In the **Anders** brief, Father raises two issues challenging the sufficiency of the evidence to support the termination of his parental rights to Child. **See Anders** Brief at 1-7; Father's Concise Statement at 1.[3] Those issues are as follows:

> I. Whether the trial court abused its discretion by terminating Father's parental rights under Section 2511(a)(2), (5) and (8) when Father contends that he completed the goals set out for him by the agency and is capable of parenting his son?
>
> II. Whether the trial court abused its discretion by determining that termination of Father's parental rights would meet the needs and welfare of the child under Section 2511(b)?

**Anders** Brief at 1.

To withdraw under **Anders**, court-appointed counsel must satisfy certain technical requirements. First, counsel must "petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous." **Commonwealth v. Miller**, 715 A.2d 1203, 1207 (Pa. Super. 1998). Second, counsel must file an **Anders** brief, in which counsel:

> (1) provide[s] a summary of the procedural history and facts, with citations to the record; (2) refer[s] to anything in the record that counsel believes arguably supports the appeal; (3) set[s] forth counsel's conclusion that the appeal

---

[3] In the concise statement that accompanied the notice of appeal, Father stated his issues somewhat differently from his **Anders** brief, but we find that Father adequately preserved his issues for our review.

is frivolous; and (4) state[s] counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009).

Finally, counsel must furnish a copy of the *Anders* brief to her client and advise the client "of [the client's] right to retain new counsel, proceed *pro se* or raise any additional points worthy of this Court's attention." *Commonwealth v. Woods*, 939 A.2d 896, 898 (Pa. Super. 2007).

If counsel meets all of the above obligations, "it then becomes the responsibility of the reviewing court to make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous." *Santiago*, 978 A.2d at 355 n.5. It is only when all of the procedural and substantive requirements are satisfied that counsel will be permitted to withdraw.

Here, in her motion for leave to withdraw, Counsel complied with each of the requirements of *Anders*. Counsel indicates that she conscientiously examined the record and determined that an appeal would be frivolous. Further, Counsel's *Anders* brief comports with the requirements set forth by the Supreme Court of Pennsylvania in *Santiago*. Finally, attached to her motion for leave to withdraw is a copy of her letter to Father, dated February 11, 2017. In compliance with *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005) the letter advised Father of his right to proceed *pro se* or retain alternate counsel and file additional claims, and stated Counsel's

intention to seek permission to withdraw. Accordingly, Counsel has complied with the procedural requirements for withdrawing from representation, and we will proceed with our review.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

> As [the Pennsylvania Supreme Court] discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead [appellate courts] must defer to the trial judges so long as

the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.***

In the ***Anders*** brief, Father contends that the trial court abused its discretion and erred as a matter of law in concluding that the evidence was sufficient to support the involuntary termination of his parental rights under section 2511(a)(2), (5), (8), and (b). Specifically, Father suggests that the trial court erred in determining that he was not able to parent Child because of his incarceration, and that the termination of his parental rights would meet the needs and welfare of Child.

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, the trial court terminated Father's parental rights under section

2511(a)(2), (5), (8) and (b). We will analyze the trial court's decision to terminate Father's parental rights under section 2511(a)(2) and (b). These sections provide:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

We have stated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse,

- 10 -

neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (internal citations omitted).

Our Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

> § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."
>
> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d at 827 (internal citations and some internal quotations omitted).

Moreover, our Supreme Court instructed:

> [I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential

- 11 -

parental care, control or subsistence and [] the causes of the incapacity cannot or will not be remedied.

***In re Adoption of S.P.***, 47 A.3d at 828.

After re-visiting its decision in ***In re: R.I.S.***, 36 A.3d 567 (Pa. 2011), regarding incarcerated parents, the Supreme Court stated:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). ***See e.g. Adoption of J.J.***, 515 A.2d at 891 ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [***In re:***] ***E.A.P.***, [944 A.2d 79, 85 (Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

***In re Adoption of S.P.***, 47 A.3d at 830-31.

Within the trial court's opinion, the trial court explained that Father's incarceration has "unequivocally" caused Father to be unable to provide

"essential parental care, control or subsistence" to Child – and for Child to be

without essential parental care.  As the trial court explained:

> Here, the facts unequivocally establish that Father's incarceration has caused Child to go without essential parental care.  At the time of Child's birth [in November] 2011, Father was incarcerated.  Father remained incarcerated until May [] 2014.  Upon his release, Father lived with Child for six months.  During that time, Father did not attempt to contact or cooperate with OCYF, or to remedy the cause of Child's dependency.  On October 31, 2014, Father was again incarcerated and has remained so since that time.  Outside of the limited six month timeframe in which Father lived with Child, Father has been unable to parent Child due to his continued incarceration.  Father has an extensive criminal history prior to Child's birth and has continued to lead that lifestyle.  Child has been in the care of OCYF since January 28, 2015, and Father will be unable to assume a role in which he is able to provide essential parental care for Child until December [] 2017[,] at a minimum.
>
> Father asserts that he has sent letters to the Foster Parent while incarcerated and has had phone calls with Child. Father testified that he "just want[s] to remain in [Child's] life no matter what the outcome is. . . .  I'm doing everything that I can . . . [t]hat I'm able to from incarceration."  However, [the trial court] does not credit Father's testimony that he would "do anything" to remain in [Child's] life when, by Father's own admission, he chose to forge documents for a fellow inmate[, and thereby] violate the [boot camp's] policy which extended his release date. Accordingly, [the trial court] is not persuaded that Father has corrected his criminal tendencies and that his repeated criminal activity demonstrates his incapacity to parent Child.
>
> Even if Father completed programs while incarcerated that are consistent with meeting his FSP goals, the completion of these programs does not remedy his inability to parent. FSP compliance and remedy or removal of condition[s] is not determinative of the capacity to parent.  Furthermore, "when a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not

- 13 -

on what the parent wants or which goals the parent has achieved." ***In re K.C.***, 903 A.2d 12, 15 (Pa. Super. 2006). With the facts concerning Father's inability to provide care for [] Child considered, [the trial court] found OCYF met the statutory ground of 23 Pa.C.S.A. § 2411(a)(2).

Trial Court Opinion, 1/13/17, at 8-9 (some internal citations and capitalization omitted).

This Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***In re A.L.D.*** 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. ***Id.*** at 340. The evidence demonstrated that Father's continued incapacity, neglect, and refusal to parent could not or would not be remedied, despite OCYF's offering reasonable efforts to assist in his reunification with Child.

A parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010). We stated in ***In re Z.P.***, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***Id.*** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent,

healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004).

After our careful review of the record in this matter, we find that the trial court's credibility and weight determinations are supported by competent evidence in the record. ***In re Adoption of S.P.***, 616 Pa. at 325-326, 47 A.3d at 826-827. Accordingly, we find that the trial court's determinations regarding section 2511(a)(2) are supported by sufficient, competent evidence in the record and that Father's claim of error in this regard is frivolous.

After having determined that the requirements of section 2511(a) were satisfied, we proceed to review whether the requirements of subsection (b) were satisfied. ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). ***Id.*** at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court declared:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993), the Supreme] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional

> bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.
>
> ***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

As the trial court explained, termination of Father's parental rights was in the best interests of Child:

> Here, [the trial court] evaluated the bond between Father and Child and determined that there was no indication that an emotional bond exists to the extent that the termination of parental rights of Father would cause Child to suffer extreme emotional consequences. . . . It is without question that Father has been incarcerated for the majority of Child's life. Father was merely present in the same home as Child for a total of six months. When Father was first released from incarceration, Child was only two [] years of age. Father was incarcerated again before [] Child's third birthday. Any detriment that Child would have suffered from termination has already been endured because of Father's incarceration and absence from Child's life. . . .
>
> [Further,] Child has been in a stable foster home for the duration of his placement. On October 20, 2016, Child was placed in an adoptive foster home with [his sibling, N.C.,] where they will remain permanently. Ms. Deak testified that it is important that Child and N.C. be adopted together and the adoptive Foster Parent really wants to adopt the kids. She was actually one of the [previous] foster mother's cousin[s] . . . [s]o, she was really interested in having both of the kids live with her. [The trial court] carefully considered the fact that Child will have to adjust to a new foster home[;] however, th[e trial court] determined that an adoptive placement with N.C. would provide the stability and permanence Child needs.

Trial Court Opinion, 1/13/17, at 10-11 (some internal quotations omitted).

The evidence in the record thoroughly supports the trial court's credibility and weight assessments regarding Child's needs and welfare, and

the absence of any bond with Father. We thus conclude that the trial court did not abuse its discretion as to section 2511(b). *See In re Adoption of S.P.*, 47 A.3d at 826-27. Father's claim to the contrary is frivolous. In addition, after an independent review of the entire record, we see nothing that might arguably support this appeal. The appeal is, therefore, wholly frivolous. Accordingly, we affirm the trial court's order and grant Counsel's petition to withdraw appearance.

Order affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/10/2017